**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

| | | |
|---|---|---|
| **SYNOVUS BANK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Civil No. 1:10cv172** |
| | ) | |
| **JAMES G. KARP, G. DANIEL SIEGEL, and THE KARP FAMILY LIMITED PARTNERSHIP,** | ) ) ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |
| | ) | |
| **SYNOVUS BANK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Civil No. 1:10cv201** |
| | ) | |
| **BARRON S. WALL,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |
| | ) | |
| **SYNOVUS BANK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Civil No. 1:10cv202** |
| | ) | |
| **KEVIN J. TRACY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

| | |
|---|---|
| NATIONAL BANK OF SOUTH CAROLINA, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Civil No. 1:10cv215 |
| | ) |
| ANTHONY J. BARBIERI, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |
| | ) |
| NATIONAL BANK OF SOUTH CAROLINA, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Civil No. 1:10cv217 |
| | ) |
| 3GMA REALTY, LLC, and GERALD ABATEMARCO, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| | ) |
| SYNOVUS BANK, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Civil No. 1:10cv218 |
| | ) |
| GREGORY S. KEARY, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

| | | |
|---|---|---|
| NATIONAL BANK OF SOUTH CAROLINA, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil No. 1:10cv220 |
| BENJAMIN W. ATKINSON and DANIEL S. HINKSON, | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) ) | |
| NATIONAL BANK OF SOUTH CAROLINA, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil No. 1:10cv221 |
| KATHERINE H. WILLIAMS, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |
| SYNOVUS BANK, | ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil No. 1:10cv231 |
| PATRICIA M. TRACY, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION AND ORDER

**THIS MATTER** is before the Court on the Plaintiff Synovus Bank's Motion for Summary Judgment [Doc. 83].

## I. PROCEDURAL BACKGROUND

This case has its origin in a series of collection actions brought by the Plaintiff Synovus Bank, the successor in interest through name change and by merger with The National Bank of South Carolina ("NBSC") ("Synovus Bank" or "Bank"), against the Defendants Barron S. Wall; Kevin J. Tracy; Anthony J. Barbieri; Benjamin W. Atkinson[1]; Katherine H. Williams[2]; and Patricia M. Tracy (collectively, the "Borrowers") in the Buncombe County General Court of Justice, Superior Court Division.[3]  In its collection actions, the Bank seeks the recovery of money it contends that the Borrowers owe pursuant to various loan agreements the Borrowers executed in order to

---

[1] On November 4, 2013, Defendant Benjamin W. Atkinson filed a Notice of Bankruptcy [Doc. 125].  According to the automatic stay provisions of 11 U.S.C. § 362, this matter is therefore stayed with respect to Defendant Atkinson.

[2] On November 18, 2013, Defendant Katherine Williams filed a Notice of Bankruptcy [Doc. 128].  According to the automatic stay provisions of 11 U.S.C. § 362, this matter is therefore stayed with respect to Defendant Williams.

[3] NBSC also brought suit against Defendants James G. Karp, G. Daniel Siegel, and the Karp Family Limited Partnership (collectively, the "Karp Defendants"); Gerald Abatemarco and 3GMA Realty, LLC (collectively, the "Abatemarco Defendants"); Gregory S. Keary ("Keary"); and Daniel S. Hinkson ("Hinkson").  Subsequent to oral argument on the Bank's summary judgment motion, the parties advised the Court that the claims and defenses between the Bank and these Defendants have been settled and that stipulations of dismissal of these actions would be forthcoming.  [Docs. 126, 129, 131, 137].

finance the purchase of undeveloped lots in a real estate development in Cashiers, North Carolina, known as the River Rock subdivision ("River Rock"). The Borrowers subsequently removed each of these collection actions to this Court.

Following the removal of these actions, the Borrowers filed Answers and asserted Counterclaims against the Bank. On December 10, 2010, the Magistrate Judge consolidated these cases for all pretrial proceedings and allowed the Borrowers an opportunity to amend their Answers and assert viable Counterclaims. [Doc. 20]. The Court also directed the Bank to file a consolidated motion to dismiss the Counterclaims and for the Borrowers to file a consolidated response. [Id.].

Consistent with the Court's Order, several of the Defendants filed Amended Counterclaims. Although these Counterclaims were based on the same general set of facts, the specific factual allegations and claims varied by each Borrower. For example, Defendants Atkinson, Wall, Barbieri, Kevin Tracy, and Williams asserted claims for violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.* ("Chapter 75"); fraud and fraud in the inducement; violation of the North Carolina Mortgage Lending Act, N.C. Gen. Stat. § 53-243.11; negligent misrepresentation; and violation of the Interstate Land Sales Full

Disclosure Act, 15 U.S.C. §§ 1701, *et seq.* ("ILSA"). [Barbieri Am. Counterclaim, Doc. 26; Wall Am. Counterclaim, Doc. 30; see also K. Tracy Am. Counterclaim, Case No. 1:10-cv-00202-MR-DLH, Doc. 13 and Williams Am. Counterclaim, Case No. 1:10-cv-00221-MR-DLH, Doc. 13].[4] Defendant Patricia Tracy, on the other hand, asserted only claims for violation of Chapter 75, violation of the North Carolina Mortgage Lending Act, negligent misrepresentation, and violation of the ILSA. [P. Tracy Am. Counterclaim, Doc. 29].

On January 31, 2011, the Bank filed a motion seeking the dismissal of all of the Counterclaims asserted by the Borrowers. [Doc. 31]. The Borrowers opposed the dismissal, arguing that, with the exception of their counterclaims brought pursuant to the Mortgage Lending Act, their claims were sufficiently pled and stated plausible claims for relief. [Doc. 33].

Pursuant to 28 U.S.C. § 636(b) and the Standing Orders of Designation of this Court, the Honorable Dennis L. Howell, United States Magistrate Judge, was designated to consider the Plaintiff's Motion to Dismiss and to submit a recommendation for its disposition. On October 5,

---

[4]Defendants Kevin Tracy and Williams did not file further Amended Counterclaims and instead rely on the Amended Counterclaims previously filed in their respective individual actions. Accordingly, any citations to these Amended Counterclaims will include a reference to those cases' individual case numbers.

2011, the Magistrate Judge entered a Memorandum and Recommendation regarding the Plaintiff's Motion, recommending that the Motion be denied with respect to the Borrowers' claims for fraud and for violations of Chapter 75 but granted with respect to the Borrowers' claims under the ILSA, under the North Carolina Mortgage Lending Act, and for negligent misrepresentation. [Doc. 36]. Further, the Magistrate Judge concluded Defendant Patricia Tracy had waived all counterclaims and defenses to Synovus Bank's claims because the documents she executed in connection with her loans contain various releases and waivers. Accordingly, the Magistrate Judge recommended that all of her counterclaims and defenses be dismissed. [Id. at 26-30].

Both Synovus Bank and the Borrowers filed Objections to the Magistrate Judge's Memorandum and Recommendation. [Docs. 41, 43]. On August 15, 2012, the Court entered an Order overruling the parties' Objections and adopting the Memorandum and Recommendation in its entirety. [Doc. 47].

Following a period of discovery, the Bank filed the present Motion for Summary Judgment on July 1, 2013.[5] [Doc. 83]. After receiving multiple

---

[5] In accordance with the Court's prior Order, the Bank filed a master brief in support of its Motion for Summary Judgment, along with case-specific briefs addressing the counterclaims of each of the individual Borrowers. [See Docs. 83-1, Docs. 84-92]. The

extensions of time to do so, the Borrowers filed their consolidated opposition on August 15, 2013. [Doc. 111]. The Bank filed its reply on August 26, 2013. [Doc. 121]. The Court held oral argument on the Bank's Motion on September 13, 2013.

Having been fully briefed and argued, this matter is now ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the case." News and Observer Pub. Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of

---

Borrowers responded in kind. [Docs. 111-18, 120, 122].

demonstrating the absence of a genuine issue of material fact." <u>Bouchat v.</u>
<u>Baltimore Ravens Football Club, Inc.</u>, 346 F.3d 514, 522 (4th Cir. 2003). If
this showing is made, the burden then shifts to the non-moving party who
must convince the Court that a triable issue does exist. <u>Id.</u>

In considering the facts for the purposes of a summary judgment
motion, the Court must view the pleadings and materials presented in the
light most favorable to the nonmoving party and must draw all reasonable
inferences in the nonmoving party's favor. <u>Adams v. Trustees of the Univ.</u>
<u>of N.C.-Wilmington</u>, 640 F.3d 550, 556 (4th Cir. 2011).

## III.    FACTUAL BACKGROUND

River Rock is a subdivision in Cashiers, North Carolina that originally
consisted of approximately 4,000 acres of undeveloped land. The Bank
loaned approximately $12.5 million to third party Legasus of North Carolina,
LLC ("Legasus") so that Legasus could purchase and develop River Rock.
As will be discussed in greater detail below, each of the Borrowers in this
action entered into a contract with Legasus to purchase a lot at River Rock
and financed that purchase by taking out a loan with the Bank for
approximately ninety percent of the purchase price. Each of the borrowers
spoke with the Bank's loan officer, Michael Wolf ("Wolf"), in connection with
obtaining loans to finance the lot purchases. The terms of these loans

generally provided for interest-only payments for a period ranging from one and one-half years to five years. As part of the agreement to purchase the lots, Legasus took the Borrowers' down payments for the lots and transferred the money to an account at the Bank. The Borrowers then established an automatic payment mechanism so that these funds would cover the interest payments on the loan until the funds were depleted. The Borrowers generally allege in this action that the Bank fraudulently induced them to purchase lots at River Rock at an inflated price, while knowing that the property was actually worth only a fraction of the loans' value.

Viewing the forecast of evidence in the light most favorable to the Borrowers, the following is a summary of the relevant facts applicable to each Borrower, or discrete group of Borrowers.

### A.    Barron S. Wall

Wall ("Wall") is a managing associate for a commercial insurance consulting firm in New Jersey. [Doc. 85-7, Wall Dep. at 11-12]. River Rock was presented to Wall and some friends as an investment opportunity toward the end of 2005. [Id. at 26-28]. In June of 2006, Wall took a trip to North Carolina for the first time because he was interested in the area and there was a "good possibility" that he would be purchasing a lot at River Rock. [Id. at 30-31].

Wall was introduced to River Rock over three days through Legasus and its marketers and even toured the parcels on an ATV. [Id. at 37, 39]. The marketing team "did a very good job of selling the project," and the project seemed to be a "good investment." [Id. at 38, 40]. During his visit, Wall signed a Purchase Agreement for Lot 80 on June 14, 2006, for which he later obtained a loan from Wachovia Bank. [Id. at 47, 49]. He also learned that Lot 47 was "rated the number one lot," and considered purchasing it as an investment, but also as "a possible second home or retirement opportunity." [Id. at 47]. He left River Rock "enthusiastic about the possibility and the opportunity" of purchasing Lot 47. [Id. at 62; see also id. at 60]. On June 20, 2006, less than one week after purchasing Lot 80, Wall signed a Purchase Agreement for Lot 47. [See Doc. 85-3, Purchase Agreement; Doc. 85-7, Wall Dep. at 66, 80].

Wall believes that he spoke to Michael Wolf twice, although the first conversation was to arrange a time for a follow-up call. [Doc. 85-7, Wall Dep. at 75-76]. The second call was more "substantive," lasted for "[p]ossibly a few minutes," and occurred by telephone in late June or early July. [Id. at 76]. Wall stated that he communicated his "thoughts on why Lot 47 made sense," was a "good investment, the number one lot," and Wolf agreed that such reasons were "sound thinking." [Id. at 77; Doc. 85-8,

Wall Int. Resp. No. 3]. Both agreed that "the best lot is the best lot," and that "the return on that investment would be, you know, appropriate at some point in time." [Doc. 85-7, Wall Dep. at 77]. Wall also expressed that he considered the lot "as an investment or potentially as a place for me to settle in, if I was to build a home there." [Id. at 154].

With respect to the allegedly inflated appraisal of his property, Wall testified "didn't even know there was one, if there was one," and he never asked how either parcel was valued. [Doc. 85-7, Wall Dep. at 107, 143]. Wall also had no information or evidence that the Bank had any knowledge that the initial appraisal of Lot 47 was incorrect or false in any way, nor did he bring any claims against the appraiser. [Id. at 148].

Wall executed the Note on or about July 14, 2006, made payable to the Bank, and has failed to pay sums due thereunder. [See Doc. 85-2, Affidavit of William Bennett ("Bennett Aff.") at ¶¶ 5, 9]. The total amount due as of July 1, 2013, is $514,334.01, with interest continuing to accrue at a rate of $77.10 per diem. [Id. at ¶¶ 12, 13].

### B.    Kevin J. Tracy

Kevin Tracy ("Kevin") is employed as a sales representative of mechanical equipment and also has a consulting business in Maryland. [Doc. 86-7, K. Tracy Dep. at 13-14]. His brother saw a presentation about

River Rock made to the South California Investors Group, traveled to River Rock to attend the grand opening and sales presentation, and told Kevin about it in approximately July of 2006. [Id. at 20, 25].

Kevin did his "homework," [Doc. 86-3 at 45], and researched the development and the area, and concluded that "[t]his was a high-end development," and that the location, mean temperature, proximity to other major metropolitan areas were all "really good." [Id. at 44-45; see also id. at 25 (the location was "deemed one of the best in the country")]. Additionally, he talked to people who were familiar with the area, and he received marketing reports and updates on sales projections, which were "way ahead of schedule." [Id. at 46; see also id. at 53 ("[t]he demand at the time was incredible")]. Additionally, Kevin discussed the purchase of the lot with his wife and with Bobby Lane, the closing coordinator. [Id. at 57, 78]. He admittedly never visited the lots in person. [Id. at 76].

Kevin purchased two lots, and both lot loans closed on the same day. Synovus Bank financed his purchase of Lot 11, and the other lot was financed by Bank of America. [Id. at 37-38]. Kevin's brother put down $26,491 of earnest money for Lot 11, and Kevin took over payment, repaid some or all of the earnest money to his brother, and purchased the lot. [Id. at 65-66].

Kevin first spoke to Wolf in approximately July of 2006, and believes that Wolf was the only Bank employee with whom he spoke prior to the loan closing. [Id. at 99]. In July of 2006, Kevin initially contacted Wolf by telephone and provided him with information for loan preapproval. [Id. at 40-41]. They spoke again later that month or in August and Wolf requested additional documents. [Id. at 41]. During the calls, they talked about Kevin's concerns with the loan terms, and they "discussed the property, and [Wolf] had reiterated on a number of occasions that it was a great investment." [Id. at 41-43; Doc. 86-8, K. Tracy Int. Resp. No. 8]. Wolf told him that if Kevin "didn't buy, somebody else would." [Doc. 86-7 K. Tracy Dep. at 42]. They also discussed Kevin's intention to purchase the property as an investment and resell before the loan matured. [Id. at 52, 55].

Between July and the closing in December, Kevin recalls faxing Wolf additional documents pertaining to the loan application on August 18, speaking to Wolf at least once in October, and speaking to him again once or twice in December "right at closing." [Id. at 40, 56, 98]. Kevin testified that he decided to purchase Lot 11 between the end of July and the beginning of August. [Id. at 98].

Kevin asked Wolf for a copy of the appraisal in December of 2006 but could not remember Wolf's response to the request, nor did Kevin ever receive a copy. [Id. at 100-02]. Although Kevin states that he would not have proceeded with the closing if the appraisal value were less than the purchase price, [Id. at 103], his obligation to purchase was not contingent upon the appraisal value. [See Doc. 86-6, Purchase Agreement].

Kevin executed the Note on December 14, 2006, made payable to the Bank, and has failed to pay sums due thereunder. [See Doc. 86-2, Bennett Aff. at ¶¶ 5, 9]. The total amount due as of July 1, 2013 is $390,877.37, with interest continuing to accrue at a rate of $57.30 per diem. [Id. at ¶¶ 12-13].

## C.    Anthony J. Barbieri

Barbieri is a certified engineering technician and works in the field of architectural signs. [Doc. 88-8, Barbieri Dep. at 19-22]. He was looking for investment property to purchase because he had just sold property in Florida and wanted to re-invest those funds. [Id. at 28, 35-39, 46]. He heard about River Rock through Diane Carroll, a realtor in New Jersey with whom Barbieri was acquainted from his membership in a business networking group. [Id. at 35, 46, 65-67]. Barbieri knew that North Carolina was a "hot" area, and that many people were moving there from Atlanta.

[Id. at 93]. He investigated the area and eventually purchased two pieces of property – one in River Rock and the other in Bryson City. [Id. at 31-32, 75]. His decision to purchase both lots was based on how much the developers wanted for the properties versus how much money he had available to invest. [Id. at 62-63].

Barbieri could not recall speaking to anyone at the Bank prior to signing the purchase contract. [Id. at 89-90]. While Barbieri could not recall the exact timing of his conversations with Wolf, he testified that they took place sometime after the date of the signing of the purchase contract and prior to closing. [Id. at 103].

Barbieri testified that Wolf told him that he would likely be able to re-sell his lot before the three-year maturity date on his loan, and that if he could not, the Bank would refinance the loan. [Id. at 108]. Wolf told Barbieri that it was "good" that Barbieri's lot was located in the first phase of River Rock because it would be available for re-sale before other lots, that the Bank "had a major investment" in River Rock because it was "funding the developer," and that Barbieri already had "made money" because his lot had appraised for more than the purchase price. [Id. at 109-10; see also Doc. 88-9, Barbieri Int. Resp. No. 3]. Barbieri admittedly never saw

the appraisal prior to purchasing the lot.  [Doc. 88-8, Barbieri Dep. at 122-23].

Barbieri admitted that he already "knew [he] was going to purchase the [River Rock] property" before he "started talking about getting financing."  [Id. at 90].

Barbieri executed a Note on July 21, 2006, made payable to the Bank, and has failed to pay sums due thereunder. The total amount due as of July 1, 2013 is $391,292.16, with interest continuing to accrue at a rate of $55.56 per diem.   [Doc. 88-2, Bennett Aff., at ¶¶ 5, 9, 12, 13].

### D.    Patricia M. Tracy

In July 2006, Patricia Tracy ("Patricia") contacted Wolf by phone from her home in Maryland regarding the purchase of a lot in River Rock.  Wolf told Patricia that River Rock was a "great investment," that she and her sons "were getting in early."  Wolf also said most people were taking the 10% down, 10 months no-payment plan and that he would send her paperwork that day.  [Doc. 120-1, P. Tracy Int. Resp. Nos. 3, 8, 9].

In October 2006, Patricia told Wolf that she was very concerned about the balloon payment that would be due at the end of the loan.  Wolf assured her not to worry as this was a "great investment" and the balance

due was not an issue if sold early, and there was no penalty for pre-payment.  [Id.].

Patricia executed a Note on November 16, 2006, made payable to the Bank, and has failed to pay sums due thereunder. The total amount due as of July 1, 2013 is $353,604.33, with interest continuing to accrue at a rate of $34.19 per diem.  [See Doc. 91-2, Bennett Aff. at ¶¶ 5, 9, 12, 13].

## IV.   ANALYSIS

In ruling on the Bank's Rule 12(b)(6) motion to dismiss, the Court dismissed the Borrowers' counterclaims under the ILSA, under the North Carolina Mortgage Lending Act, and for negligent misrepresentation.  The Court also has dismissed the counterclaims and defenses of Patricia Tracy, who signed loan documents wherein she waived such claims.  Thus, the issues that remain for disposition are the Bank's entitlement to recover on the notes and the Borrowers' remaining counterclaims and defenses for fraud and their counterclaims for unfair or deceptive trade practices under Chapter 75.  For the reasons that follow, the Court will stay this action against Defendant Atkinson and Williams.  With respect to the other Borrowers, the Court will grant the Bank's motion and enter summary judgment against each of these Borrowers and in favor of the Bank on all claims and counterclaims asserted by them.

## A.    Stay of Action Pursuant to Automatic Stay

Defendants Atkinson and Williams have each filed a notice with the Court indicating that they have filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code.  [Docs. 125, 128].  The automatic stay provisions of 11 U.S.C. § 362 prevent the Bank from proceeding on its claims against these Defendants.  It is well-settled that "[w]hen litigation is pending against the debtor at the time a bankruptcy case is commenced, the litigation is stayed automatically."  3 Collier on Bankruptcy ¶ 362.03[3] (16th ed. 2012); see also 11 U.S.C. § 362(a)(1) (providing that a bankruptcy petition operates as an automatic stay of "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor").  While the Defendants' counterclaims are not subject to the automatic stay, see In re Atlas IT Export, LLC, 491 B.R. 192, 195 (1st Cir. BAP 2013), the Court will nevertheless stay these counterclaims pending a determination by the Trustee in Bankruptcy as to whether to pursue this litigation.

## B.    Borrowers' Counterclaims/Defenses

The Court now turns to the remaining Borrowers' counterclaims for fraud and violations of Chapter 75 and their asserted defenses sounding in fraud and the breach of duty of good faith.  For the remainder of this

opinion, any reference to "Borrowers" shall be limited to the non-bankrupt Defendants.

### 1.    Fraud Counterclaims/Defenses

In order to state a valid claim for fraud under North Carolina law, a plaintiff must allege a false representation or concealment of a material fact that: (1) was reasonably calculated to deceive; (2) was made with the intent to deceive; (3) did in fact deceive the plaintiff; and (4) resulted in damages to the plaintiff.  Anderson v. Sara Lee Corp., 508 F.3d 181, 189 (4th Cir. 2007).  Additionally, the party must demonstrate that any reliance on the false representations was reasonable.  See id.

To succeed on their fraud claims, the Borrowers would have to show a false representation or concealment of a material past or present fact. See Forstmann v. Culp, 648 F.Supp. 1379, 1386 (M.D.N.C. 1986).  As previously noted, the Borrowers' fraud claims are based on conversations they had with Michael Wolf, a Bank employee.  The majority of Wolf's statements upon which the Borrowers rely in asserting their claims, however, are not actually factual in nature.  [See, e.g., Doc. 85-7, Wall Dep. at 77; Doc. 85-8, Wall Int. Resp. No. 3 (claiming that Wolf agreed that purchasing lot was a "good investment" and reflected "sound thinking"); Doc. 86-7, K. Tracy Dep. at 41-43; Doc. 86-8, K. Tracy Int. Resp. No. 8

(stating that Wolf had reiterated on a number of occasions that lot purchase was "a great investment"); Doc. 120-1, P. Tracy Int. Resp. Nos. 3, 8, 9 (stating that Wolf claimed that River Rock was a "great investment")]. At best, most of these statements are expressions of opinion regarding the value or quality of the property as a potential investment.[6] "North Carolina courts consistently have held that exaggerated representations by a seller as to property's value are mere 'puffery' on which a buyer is not entitled to rely." Stephen Dilger, Inc. v. Meads, No. 5:11-CV-42-FL, 2011 WL 1882512, at *7 (E.D.N.C. May 17, 2011) (citing Horton v. Humble Oil & Refining Co., 255 N.C. 675, 680, 122 S.E.2d 716, 720 (1961) ("Representations which merely amount to a statement of opinion go for nothing. One who relies on such affirmations made by a person whose interest might prompt him to invest the property with exaggerated value does so at his peril, and must take the consequences of his own imprudence.")); see also Hall v. T.L. Kemp Jewelry, Inc., 71 N.C. App. 101, 106, 322 S.E.2d 7, 11 (1984) ("A representation which is nothing more than an opinion as to the value of property, absent something more, does not constitute actionable fraud.").

---

[6] To the extent that the Borrowers have cited statements of Wolf that appear to be of a past or present fact, the Borrowers have presented no forecast of evidence that any of these factual statements were not actually true.

Furthermore, several of the Borrowers claim to have been misled by Wolf's representations that the lots would increase in value over time and that they would be able to re-sell their lots before the two-year loan period expired. [See, e.g., Doc. 85-7, Wall Dep. at 77 (stating that Wolf agreed that "the return on that investment would be, you know, appropriate at some point in time"); Doc. 88-8, Barbieri Dep. at 108 (testifying that Wolf told him that he would likely be able to re-sell his lot before the three-year maturity date on his loan, and that if he could not, the Bank would refinance the loan)]. Any statements by Wolf regarding the future quality or value of the lots or the purchasers' ability to sell their lots in the future, however, "'are not regarded as fraudulent in law,' since they are not misrepresentations of a 'subsisting fact.'" Smith v. Central Soya of Athens, Inc., 604 F.Supp. 518, 530 (E.D.N.C. 1985) (citation omitted).

As the Court has previously noted, North Carolina law recognizes an exception to the general rule that statements of opinion are not actionable "if, at the time [the statement of opinion] is made, the maker of the statement holds an opinion contrary to the opinion he or she expresses, and the maker also intends to deceive the listener." Leftwitch v. Gaines, 134 N.C. App. 502, 508-09, 521 S.E.2d 717, 723, disc. rev. denied, 351 N.C. 357, 541 S.E.2d 713 (1999). The Borrowers, however, have failed to

present a forecast of evidence that Wolf made any of the aforementioned statements while holding a contrary opinion.

Even if any of the opinions expressed by Wolf were actionable, no reasonable fact-finder could infer from the forecast of evidence presented that the Borrowers actually relied upon these opinions. For the most part, the Borrowers already had entered into the purchase agreements for the properties when they had the conversations with Wolf in which he supposedly made the alleged misrepresentations.[7] Thus, they were already committed to purchasing the lots when Wolf made the alleged misrepresentations. For these reasons, the Court concludes as a matter of law that Wolf's statements could not have been the cause of the Borrowers' harm. See Carty v. Westport Homes of N.C., Inc., 472 F. App'x 255, 259 (4th Cir. 2012) ("There can be no recovery in fraud for a deception by which a person is induced to do something which he is already bound to do.") (internal quotation marks and citation omitted).

---

[7] The only exception to this was Defendant Kevin Tracy, who testified that at least some of his conversations with Wolf occurred before he signed a Purchase Agreement with the developer. Tracy testified that he conducted a significant amount of investigation into both the area in general and River Rock in particular and consulted with his family before deciding to purchase his lot. On the basis of this forecast of evidence, no reasonable fact-finder could conclude anything but that Tracy decided to purchase his lot based on his own independent investigation, not due to his reliance upon Wolf's statements. See Swann v. Regions Bank, 17 So.3d 1180, 1194 (Ala. Ct. App. 2008) (affirming grant of summary judgment on lack of actual reliance where borrower accepted bank's recommendation of builder after conducting his own investigation).

Even if reliance by the Borrowers could be shown, such reliance was unreasonable as a matter of law. First, reliance on "'booster' statements of enthusiastic agents" is unreasonable "because such statements "are to be expected." See Glaser v. Enzo Biochem, Inc., 126 F. App'x 593, 603 (4th Cir. 2005) (citation omitted) (Wilkinson, C.J., concurring in part and dissenting in part).[8]

Second, it was unreasonable for the Borrowers to rely on Wolf's opinions when the Purchase Agreements expressly warned the Borrowers that there was no guarantee that the property would appreciate and that they should not expect to receive any economic benefits from their purchases:

> **24. Potential Economic Benefits Disclaimed:**
>
> (1)    The Purchaser acknowledges and agrees that the Lot has not been marketed with required or guaranteed resale arrangements or other similar services whereby emphasis was/is placed on the economic benefits to the Purchaser to be derived from the resale efforts of the Seller or any party arranged for by the Seller.

---

[8]  The Borrowers argue that Wolf's statements are distinguishable because his statements were made not in course of promoting of the Bank's "wares" but rather were made in course of promoting the *developer's* product, that is, the River Rock development, and that he made such statements "with an aura of objectivity due to his status as a banker." [Doc. 111 at 22].  The Borrowers, however, cite no case law in support of this distinction.  At bottom, Wolf was engaged in the aggressive marketing of one thing: the Bank's financial services.  That Wolf appeared to affirm and approve of the Borrowers' prior decisions to purchase in River Rock does not change this fact.

(2)     The Purchaser acknowledges and agrees that the Seller has not promised, suggested, or indicated in any way that the Purchaser will receive any economic benefit whatsoever as a result of the Purchaser's ownership of the Lot, and Seller does hereby disclaim any such promise, suggestion or indication made by any person whatsoever.

[See, e.g., Purchase Agreement, Doc. 85-6].

Third, the Borrowers' asserted reliance was unjustified because they had ample opportunity to conduct an independent investigation of the property and reach their own conclusions about the development and its risks prior to purchasing the property but failed to do so.   As the North Carolina Court of Appeals has explained:

> In cases involving the purchase of real property, reliance is not reasonable if a plaintiff fails to make any independent investigation" unless the plaintiff can demonstrate: (1) "it was denied the opportunity to investigate the property," (2) it "could not discover the truth about the property's condition by exercise of reasonable diligence," or (3) "it was induced to forego additional investigation by the defendant's misrepresentations."

Sunset Beach Dev., LLC v. AMEC, Inc. 196 N.C. App. 202, 209, 675 S.E.2d 46, 52 (2009) (quoting RD & J Properties v. Lauralea–Dilton Enters., LLC, 165 N.C. App. 737, 746, 600 S.E.2d 492, 499 (2004)).   Here, the parties were engaged in arm's length transactions.   Most of the Borrowers were sophisticated investors, and all of them were seeking to

"flip" the property in a relatively short period of time for a profit. Importantly, none of the Borrowers have presented a forecast of evidence to suggest that the Bank denied them the opportunity to inspect the property or that they were otherwise induced to forego additional investigation as a result of Wolf's representations.

In this respect, this case is easily distinguishable from Phelps-Dickson Builders, L.L.C. v. Amerimann Partners, 172 N.C. App. 427, 617 S.E.2d 664 (2005), a case relied on by the Borrowers. In that case, the plaintiff, a builder, entered into a contract with the defendant, a developer, to buy lots and build model homes based on the developer's representations about there being solid contracts to purchase lots in the subdivision, presales, and eager buyers. Id. at 429, 617 S.E.2d at 666. When those representations turned out to be false, the builder sued, asserting, among other things, claims of fraud and unfair and deceptive trade practices. Id. at 432, 617 S.E.2d at 667. The trial court granted the developer summary judgment, but the Court of Appeals reversed. In so holding, the Court of Appeals concluded that there was a genuine issue of fact as to whether the builder's reliance was reasonable because the builder had an inferior opportunity to investigate the developer's representations as that information was exclusively in the control of the

developer and could not otherwise be readily or easily verified. 172 N.C. App. at 437-39, 617 S.E.2d at 670-71.

By contrast, in the present case, the Borrowers have failed to present any forecast of evidence to establish that the Bank held any superior knowledge regarding the wisdom of investing in the undeveloped lots in River Rock. Moreover, the Borrowers have failed to present anything to indicate that information regarding the development was exclusively in the control of the Bank and could not have been readily verified by the Borrowers. Indeed, the Borrowers had many means available to them to assess the value and condition of the property at issue, including independent appraisals, comparable sales data, and personal inspections of the property. Most of the Borrowers, however, chose to forego any independent investigation of their investment prior to purchase. Under these circumstances, the Bank cannot be held liable for the Borrowers' failure to conduct their own due diligence.

Further, the Borrowers' asserted reliance was unjustified because their relationship with the Bank was contractual and did not give rise to a fiduciary duty to ensure that the Borrowers were making a sound investment. See In re Fifth Third Bank, Nat'l Ass'n – Village of Penland Litig., 719 S.E.2d 171, 180 (N.C. Ct. App. 2011) (noting that borrowers

"cited no authority tending to establish that [the lender] had a legal duty to investigate and monitor the activities of the developers and the progress of the development or to communicate to [the borrowers] the results of any such investigation or any other deficiencies associated with the [development]."), cert. denied, 731 S.E.2d 687 (2012); Camp v. Leonard, 133 N.C. App. 554, 560, 515 S.E.2d 909, 913 (1999) ("a lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party").

Finally, to the extent that the Borrowers base their fraud claims and defenses on the Bank's use of allegedly inflated appraisals, the Borrowers have not presented any forecast of evidence to suggest that the Bank had any knowledge that the appraisals were incorrect or false in any way. Moreover, the Borrowers have offered no forecast of evidence that they relied on these appraisals in purchasing the properties. Indeed, none of the Borrowers even saw an appraisal prior to closing.

For all of these reasons, the Court concludes that the Bank is entitled to summary judgment on the fraud counterclaims and defenses asserted by Wall, Kevin Tracy, Barbieri, Hinkson, and Patricia Tracy.

## 2. Chapter 75 Counterclaims

To state a claim for unfair and deceptive trade practices under Chapter 75, a party must allege sufficient facts to show "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." Spartan Leasing, Inc v. Pollard, 101 N.C. App. 450, 460-61, 400 S.E.2d 476, 482 (1991). A deceptive practice is one that has "the capacity or tendency to deceive the average consumer, but proof of actual deception is not required." Id. at 461, 400 S.E.2d at 482.

To the extent that the Borrowers' Chapter 75 claims are derivative of their fraud claims, such claims also fail for the reasons set forth above. See SilverDeer, LLC v. Berton, No. 11 CVS 3539, 2013 WL 1792524, at *10 (N.C. Super. Ct. Apr. 24, 2013) (citing Governor's Club, Inc. v. Governors Club Ltd. P'ship, 152 N.C. App. 240, 255, 567 S.E.2d 781 (2002)).

The Borrowers contend that the Bank violated Chapter 75 by "closely . . . align[ing] itself with the developer" and by "holding [itself] out to the public (including the borrowers here) that it was an affiliate of the developer." [Doc. 111 at 23]. The Borrowers' assertions that the Bank should be held liable for its close association with Legasus, however, are

insufficient to state a claim under Chapter 75 absent a forecast of evidence that the Bank was an actual or apparent agent of the developer.  See In re Fifth Third Bank, 719 S.E.2d at 179-80 (dismissing Chapter 75 claim based on allegations that lender "gave an air of legitimacy to the Penland development by virtue of its involvement in the developers' lot sales program" and that lender clearly "had an agreement or working relationship with the developers with respect to the Penland lot loans.").

The Borrowers also rely on the ILSA to support their Chapter 75 claims.  The Borrowers' ILSA claims, however, were dismissed at the Rule 12 stage.  To the extent that the Borrowers claim that the same conduct that would violate the ILSA would also violate Chapter 75, such argument fails.  The only forecast of evidence the Borrowers have presented to support this claim is an advertising flyer, distributed by NBSC to promote its banking programs and mortgage packages, which uses the word "affiliate." The "affiliate" reference in the flyer, however, was not to the Bank and Legasus, but rather to NBSC and Synovus Mortgage Corp. as being "Affiliates Working Together to Make the Most of Your *Lending* Experience."  [Flyer, Doc. 111-2 (emphasis added)].  In any event, there is no testimony that any of the Borrowers even saw the flyer, much less were misled by it.

The Borrowers appear to have abandoned their Chapter 75 claims to the extent that such claims were based on a theory that the use of inflated appraisals by the Bank as part of its loan underwriting process constitutes an unfair or deceptive trade practice. Even if the Borrowers were to pursue this theory, however, their claims would nevertheless be subject to dismissal as the undisputed forecast of evidence demonstrates that none of the Borrowers even saw an appraisal prior to closing and, in any event, their Purchase Agreements were not dependent on them. As such, the Borrowers could not have reasonably relied on such appraisals in proceeding with their respective lot purchases. See In re Fifth Third Bank, 719 S.E.2d at 179 ("Thus, given the complete absence of any evidence tending to show a causal connection between the allegedly defective appraisals and the injury that Plaintiffs claim to have suffered, we conclude that the allegedly defective appraisals do not support a finding of liability pursuant to [Chapter 75].").

For these reasons, the Court concludes that the Bank is entitled to summary judgment on the Borrowers' counterclaims under Chapter 75.

### 3. Affirmative Defense of Breach of Duty of Good Faith

The Borrowers assert an affirmative defense to their liability under the Notes based on the duty of good faith and fair dealing recognized in the

Uniform Commercial Code (U.C.C.) and codified into South Carolina law at S.C. Code § 36-1-203 ("Every contract or duty within this act imposes an obligation of good faith in its performance or enforcement.").[9]  The U.C.C.'s good faith requirement, however, applies only to the exercise of discretion in the performance or enforcement of the terms of the contract.  Because the Borrowers do not contend that the Bank acted in bad faith in exercising its discretion under the terms of the applicable loan agreements, the duty of good faith is not applicable here.

In any event, the Borrowers have failed to present a forecast of evidence that the Bank acted in bad faith.  Indeed, the Borrowers have not presented any forecast of evidence that Wolf actually held an opinion contrary to the ones he gave or that he was withholding negative information about the developer.  Wolf testified, without contradiction, that he never made any statement to any Borrower that he believed to be untrue and that when he told them that the lot purchases were good investments, he made that statement honestly and in good faith.  [Doc. 121-1, Wolf Dep. at 268-69].  For these reasons, the Bank is entitled to a

---

[9] The promissory notes at issue provide that they are to be governed by South Carolina law, and thus South Carolina applies to the Borrowers' defenses against the Bank.  See Synovus Bank v. Coleman, 887 F.Supp.2d 659, 668 (W.D.N.C. 2012).

grant of summary judgment as to the Borrowers' affirmative defense of the breach of the duty of good faith and fair dealing.

### C. The Bank's Right to Recover under the Notes

Having addressed each of the non-bankrupt Borrowers' counterclaims and defenses, the Court now turns to issue of whether the Bank has established as a matter of law that it is entitled to recover under each of the promissory notes at issue.

The individual complaints filed by the Bank against each Borrower seek to recover amounts due under the loan documents. The promissory notes provide that they are to be governed by South Carolina law, and thus South Carolina applies to the Bank's claims against each borrower. See Coleman, 887 F.Supp.2d at 668.

"A promissory note is an unconditional obligation, sufficient in itself to support a cause of action." Ray v. South Carolina Nat'l Bank, Inc., 281 S.C. 170, 173-74, 314 S.E.2d 359, 361 (1984). Where the notes are clear, unambiguous, and properly executed, and there is an absence of fraud, accident or mistake, they should be enforced. Id.

For each of the consolidated cases, the Bank has established that true and correct copies of the relevant loan documents, including the promissory notes and guaranties, have been presented; that the Borrowers

executed the applicable documents; and that Borrowers are in default under the documents they executed. Moreover, the Bank has presented an undisputed forecast of evidence to establish that it has possession of the original promissory notes; that the Bank is the named payee on those notes; and that those notes have not been endorsed, transferred or assigned. Finally, for the reasons stated above, the Court has concluded that the Borrowers have failed to present a forecast of evidence from which a reasonable jury could find any fraud on the part of the Bank, and therefore the Borrowers' assertion of these affirmative defenses fails to defeat the Bank's right to recover. Accordingly, the Bank has established its right to recover amounts due from each Borrower pursuant to the loan documents.

Most of the loan documents at issue also provide for the recovery of costs, including attorneys' fees. [See Doc. 85-3, Wall Promissory Note ("If you [the Bank] hire an attorney to help collect this loan, I [the Borrower] agree to pay the court costs and reasonable attorney's fees up to fifteen percent (15%) of the unpaid balance."); Doc. 88-3, Barbieri Promissory Note (same); Doc. 91-3, P. Tracy Promissory Note (same)].[10] Contractual

---

[10] The promissory note executed by Kevin Tracy does not appear to provide for the recovery of costs or attorneys' fees. [Doc. 86-3]. Part of the note, however, was scanned in such a way as to render it illegible.

attorneys' fee provisions are enforceable under South Carolina law.  See e.g., CT&T EV Sales, Inc. v. 2AM Group, LLC, No. 7:11-1532-TMC, 2012 WL 3010911, at *2 (D.S.C. July 13, 2012); Federal Land Bank of Columbia v. Davant, 292 S.C. 172, 181, 355 S.E.2d 293, 298 (S.C. Ct. App. 1987). Accordingly, the Court concludes that the Bank also is entitled to an award of the Bank's costs, including reasonable attorneys' fees, where such costs and fees are explicitly provided for by the parties' agreements.  The Court will allow the Bank fourteen (14) days to file a statement of the costs and reasonable attorneys' fees incurred in each of these actions.  The parties are encouraged to confer and attempt to stipulate to the amount of these awards.  If the parties cannot so stipulate, the Borrowers shall have fourteen (14) days from the filing of the Bank's statement to file their opposition to the requested amounts.

Finding no just reason for delay, the Court will enter a final judgment with respect to the Bank's claims against Defendants Barron S. Wall, Kevin J. Tracy, Anthony J. Barbieri, and Patricia M. Tracy.  See Fed. R. Civ. P. 54(b).

## O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that this action is hereby **STAYED** with respect to Defendants Benjamin Atkinson and

Katherine Williams pending a determination of the respective Trustees in Bankruptcy as to whether to pursue this litigation. Counsel for the Defendants is directed to provide a copy of this Order to the respective Trustees.

**IT IS FURTHER ORDERED** that Plaintiff Synovus Bank's Motion for Summary Judgment [Doc. 83] is **GRANTED**, and the Plaintiff is entitled to judgment against the following Borrowers as follows:

(1)     The Plaintiff is hereby awarded against the Defendant Barron S. Wall the sum of Five Hundred and Fourteen Thousand Three Hundred and Thirty-Four Dollars and One Cent ($514,334.01), together with prejudgment interest of Fifteen Thousand Three Hundred and Forty Two Dollars and Ninety Cents ($15,342.90), calculated at a rate of $77.10 per diem from and after July 1, 2013 through the date of Judgment;

(2)     The Plaintiff is hereby awarded against the Defendant Kevin J. Tracy the sum of Three Hundred and Ninety Thousand Eight Hundred and Seventy-Seven Dollars and Thirty-Seven Cents ($390,877.37), together with prejudgment interest of Eleven Thousand Four Hundred and Two Dollars and Seventy Cents ($11,402.70), calculated at a

rate of $57.30 per diem from and after July 1, 2013 through the date of Judgment;

(3)    The Plaintiff is hereby awarded against the Defendant Anthony J. Barbieri the sum of Three Hundred and Ninety-One Thousand Two Hundred and Ninety-Two Dollars and Sixteen Cents ($391,292.16), together with prejudgment interest of Eleven Thousand and Fifty-Six Dollars and Forty-Four Cents ($11,056.44), calculated at a rate of $55.56 per diem from and after July 1, 2013 through the date of Judgment; and

(4)    The Plaintiff is hereby awarded against the Defendant Patricia M. Tracy the sum of Three Hundred and Fifty-Three Thousand Six Hundred and Four Dollars and Thirty-Three Cents ($353,604.33), together with prejudgment interest of Six Thousand Eight Hundred and Three Dollars and Eighty-One Cents ($6,803.81), calculated at a rate of Thirty-Four Dollars and Nineteen Cents ($34.19) per diem from and after July 1, 2013 through the date of Judgment.

**IT IS FURTHER ORDERED** that the Bank shall submit its statement of attorney's fees and costs within fourteen (14) days of the entry of this Order.

A Judgment consistent with this Memorandum of Decision and Order shall be entered contemporaneously herewith.

**IT IS SO ORDERED.** Signed: January 17, 2014

Martin Reidinger
United States District Judge